United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

M.D.,

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

Case No. 25-cv-05525-LJC

**ORDER RESOLVING SOCIAL SECURITY APPEAL**

Re: Dkt. Nos. 12, 17

Plaintiff M.D.[1] challenges the final decision of the Commissioner of Social Security (Commissioner) denying her applications for disability insurance benefits under Title II and Title XVI of the Social Security Act. Both parties have consented to magistrate judge jurisdiction, ECF Nos. 6 and 7, and have filed their competing briefs. ECF Nos. 12, 17. M.D. has filed a reply to the Commissioner's brief. ECF No. 18. M.D. requests that the Court reverse the Commissioner's decision and award her benefits, or in the alternative remand the matter for further proceedings in front of the Administrative Law Judge (ALJ). *See* ECF No. 12 at 28-30. The Commissioner agrees that remand is warranted, but argues that it would be improper for the Court to make a judicial finding of disability and award benefits. *See* ECF No. 17 at 2. Having considered the parties' briefing, and for the reasons discussed below, the Court finds in favor of M.D. and remands the matter for an immediate award of benefits.

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the Plaintiff only by her initials. This Order does not alter the degree of public access to other filings in this action.

## I. BACKGROUND

### A. Procedural History

M.D. applied for Title II disability benefits and Title XVI supplemental security income in June 2016 based on her alcoholism, OCD, depression, and anxiety, stating that she had been unable to work due to her conditions since December 1, 2015. AR at 318-24, 357. M.D.'s applications, and subsequent requests for reconsideration, were denied. *Id.* at 209-16. On December 6, 2018, after holding two hearings, ALJ David LaBarre issued an unfavorable decision against M.D. *Id.* at 54-67. M.D. appealed the decision to the Appeals Council, who denied her appeal, *id.* at 728, and M.D. proceeded to file an action for judicial review in this District pursuant to 42 U.S.C. § 405(g), case number 20-cv-00413-VC. *Id.* at 735. The parties stipulated to remand the matter for a new hearing, and the Appeals Council directed the ALJ to apply the correct standards for evaluating opinion evidence. *Id.* at 745, 751.

Per instructions from the Appeals Council, ALJ Vincent Misenti held a hearing on December 17, 2020, and issued an unfavorable decision. *Id.* at 635-75. After the Appeals Counsel declined to assume jurisdiction of M.D.'s challenge to the ALJ's decision, M.D. filed a second lawsuit in this District, 23-cv-01995-LJC (the Second Action). *Id.* at 621-23, 1633. The Court found in favor of M.D. and remanded the matter for further proceedings. In its order (the 2024 Order[2]) granting M.D.'s motion for summary judgment in the Second Action, the Court agreed with M.D. that the ALJ had erred when evaluating the medical opinions of record, incorrectly discounted M.D.'s symptom testimony, and improperly rejected a third-party statement from M.D.'s mother. AR at 1639, 1649-54.

After this Court ruled in favor of M.D. in the Second Action and remanded the matter, a fourth administrative hearing was held, again in front of ALJ Misenti. *Id.* at 1548. He issued an unfavorable ruling on March 28, 2025, and M.D. proceeded to file suit. *Id.* 1517; *see* ECF No. 1 (Compl.).

---

[2] The 2024 Order is included in the AR at 1633-55. *See also M.D. v. O'Malley*, No. 23-CV-01995-LJC, 2024 WL 3646952, at *1 (N.D. Cal. Aug. 1, 2024).

**B. Medical History**

M.D., now aged fifty-two, has a long history of anxiety, depression, obsessive compulsive disorder, self-harm and suicidal ideation, and alcohol dependence with periods of sobriety. A detailed summary of her relevant medical history through 2020 is included in the 2024 Order. *See* AR at 1633-36.

Her more recent medical records indicate that despite her sobriety for several years, she continued to experience anxiety and depression. Although medical notes from January 2021 reflect that M.D. was "[p]leasant and cooperative," she was noted as being in an "anxious" mood and reporting "doing the same very anxious and nervous." *Id.*at 2383, 2390. She reported that her "medication helps control suicidal thoughts," but still had "frequent" suicidal ideation. *Id.* at 2391. A subsequent progress report from April 2021 noted that M.D. had complained of "increased anxiety" in the past two weeks, but denied experiencing "bipolar symptoms of goal driven activity or increase elevated mood" and had not "been hospitalized or visited the ER for psychiatric reasons in the interim." *Id.* at 2440. A progress note from June 2021 indicated that she was "feeling anxious," and notes from a telemedicine visit in October of that year stated that M.D. had "multiple episodes" of anxiety spreading from her chest. *Id.* at 2590-91. These symptoms continued through January 2022. *Id.* at 2610 (describing that M.D. had "multiple episodes" of anxiety spreading from her chest per day).

M.D.'s mother, D.D., completed a function report describing how M.D.'s conditions limited her activities. AR at 1800. In the report, she explained that M.D. "has panic attacks almost every day, and just about everything is difficult for her because of her depression." *Id.* She explained that M.D. "cannot even take care of her personal hygiene without help and encouragement," could not "do small tasks even with repeated reminders" and required "lots of assistance," cried often, and got frustrated and angry easily. *Id.* M.D.'s mother explained that M.D. had "problems with night terrors and horrible nightmares" so could not stay asleep at night, and spent most of days in bed sleeping. *Id.* at 1800-01. Her mother reported completing most household chores herself, and explained that M.D. rarely changed her clothes, bathed at most once every ten days and never on her own volition, could not "stay on top of taking medication by

herself," had her mother open and read her mail, and at most prepared one simple meal a day, such as "eggs or cereal." *Id.* at 1801-2, 1805. She explained that M.D. was "afraid to be by herself or with other people besides me," and would only leave the house to go grocery shopping with her mother or to attend medical appointments. *Id.* at 1803. She further explained that M.D. panicked while stressed and "in the past has engaged in self-harm behaviors when stressed," was "more afraid of people now than she was five or ten years ago," and had a short attention span and could not "concentrate enough to read a book anymore." *Id.* at 1804-06.

**C. Hearing Testimony**

ALJ Misenti held an administrative hearing over the phone on February 11, 2025. *Id.* at 1549. When questioned by the ALJ, M.D. testified that she was living with her mother in Modesto, California and had not worked since her alleged disability onset date of December 1, 2025. *Id.* at 1552. She explained that everything was "basically the same" in her life since the previous hearing, except that her panic attacks had "gotten a lot worse." *Id.* at 1553. She testified that she had been speaking with a psychiatrist once a month for a year but could not remember if she saw a therapist or counselor prior to that. *Id.* She testified that she took medications twice a day, which made her less anxious but did not help with her depression. *Id.* at 1554. She explained that her psychiatrist tried changing her medications during the past year to improve her symptoms but her "depression is still here." *Id.* She reported that she had been sober for three and a half years, and although she previously attended Alcoholics Anonymous, had not attended in the past year. *Id.* When the ALJ asked M.D. to describe "a typical day," she explained that she had a difficult time sleeping at night due to panic attacks so tended "to do a lot of sleeping during the day and watch TV." *Id.* at 1555. She testified that the only thing she liked to do was "[s]leep," and did not "like to leave the house" because she was "usually so anxious." *Id.* at 1556. She stated that she only left the house "a couple times a week" to go grocery shopping with her mother, but did not go to restaurants, sporting events, or parks and did not visit people. *Id.* She reported that she did not socialize with friends or neighbors. When asked about chores around the house, M.D. testified that she "tried to keep" her bedroom and bathroom clean, but her mother took care of other chores such as cooking and laundry. *Id.* at 1556-67.

M.D.'s attorney then questioned her. M.D. testified that having to complete "[a]ny" task increased her anxiety, even when she was taking her medications and seeing a psychiatrist. *Id.* at 1557. She explained that she met with her psychiatrist over the phone and had never met him in person, had requested and was waiting to begin individual therapy, and that she had delayed starting individual therapy due to her anxiety about "talking about [her] problems." *Id.* at 1558. When questioned about her hygiene habits, she agreed with her attorney that she had difficulty taking care of herself and only showered "probably once or twice a month" and wore her clothes as long as she could without changing them. *Id.* She then clarified that except for AA meetings, she had not left the house without her mother, and her mother dropped her off and picked her up from AA. *Id.* She testified that she had difficulty following simple instructions and her mother helped her open and read through her mail. *Id.* at 1558-59.

The ALJ then questioned vocational expert (VE), Jose Chaparro, about the availability of jobs for hypothetical individuals with a range of limitations. The VE testified that there were jobs available in the national economy for an individual with no past work experience and a high school education who could perform a medium range of work but was limited to simple tasks involving occasional interaction with the public. *Id.* at 1562. He testified that there would be no work for such an individual if they were off task twenty-five percent of the time or absent from work two days per month. *Id.* at 1563. He further testified that there would be no work available for that individual if they required close or frequent supervision, although they could be eligible for job coaching. *Id.* at 1566. When questioned by Plaintiff's attorney, the VE testified that there would be no jobs available for an individual with the limitations described above if they were off task eleven percent of the time or missed one day of work per month. *Id.* at 1565-66.

**D. The Five-Step Framework**

The Social Security Administration uses a five-step process to determine whether claimants are entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and

> the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).
>
> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).
>
> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).
>
> Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).
>
> Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (9th Cir. 2020). "Between the third and fourth steps, an ALJ determines a claimant's residual functional capacity, i.e., the extent of mental and physical activities a claimant can perform in a work setting despite their limitations." *Nadon v. Bisignano*, 145 F.4th 1133, 1135–36 (9th Cir. 2025).

"At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2. "At step five of the sequential process, the agency may meet its burden either '(1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines,'" known as "the grids," which

are a "short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Id.* at 1130 (quoting *Tacket*, 180 F.3d at 1099, 1101). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, they do not proceed to the next step. 20 C.F.R. § 404.1520(a)(4).

**E. The ALJ's Decision**

ALJ Misenti issued his decision denying M.D.'s application for benefits on March 28, 2025. AR at 1517. At step one, he determined that M.D. had not engaged in substantial gainful activity since the alleged disability onset date of December 1, 2025. *Id.* at 1522. At step two, he found that M.D.'s bipolar disorder with anxiety, depression, and back strain qualified as severe impairments; but that her alcoholism, obesity, and diabetes were non-severe. *Id.* at 1523-24. At step three, he determined that her impairments did not meet or equal any of the listed impairments. *Id.* at 1524-26.

He then determined that M.D. had the residual functional capacity (RFC) to perform medium work, except that she was limited to lifting, carrying, and pushing fifty pounds occasionally and twenty-five pounds frequently; sitting and standing for up to six hours in an eight-hour workday; understanding, remembering, and carrying out simple instructions only; and occasionally interacting with the public. *Id.* at 1527. In reaching this conclusion, the ALJ purported to follow a two-step analysis: first determining if there were impairments that "could reasonably be expected to produce the claimant's pain or other symptoms," and, if so, then evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms to determine" their limiting effects on M.D.'s ability to work. *Id.* He found that M.D.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that M.D.'s statements regarding the intensity, persistence and limiting effects of her symptoms were not "entirely consistent" with the medical and other evidence in the record. *Id.* at 1528. He also evaluated the medical opinions of several physicians. *Id.* at 1531-35. He found that the opinion of M.D.'s treating physician, Dr. Jee Hyun Guss, was not "well supported by medically acceptable clinical and laboratory diagnostic techniques" and thus warranted "little weight." *Id.* at 1532. He gave "partial weight" to the opinion of reviewing medical expert Dr. David Glassmire, gave

"partial weight" to the opinion of Dr. Khoi's opinion "as it pertains to the claimant's mental functioning during periods of sustained sobriety," and gave "partial weight" to the opinions of the state agency reviewing doctors as they related to M.D.'s mental functioning. *Id.* at 1532-35.

At step four, as the ALJ had determined that M.D. did not have relevant past work, he concluded that she did not have any transferable job skills. *Id.* at 1535. At step five, considering M.D.'s "age, education, work experience, and residual functional capacity," the ALJ determined that M.D. could work several jobs that existed in large numbers in the national economy, such as a kitchen helper, auto detailer, or counter supply worker. *Id.* at 1436.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court has authority to review a Commissioner's decision to deny disability benefits to a claimant. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The district court's role is "to ensure that the [ALJ's] decision was supported by substantial evidence and a correct application of the law." *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). The Court must "consider the entire record as a whole, 'weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). "Where the evidence can reasonably support either affirming or reversing the decision, [this Court] may not substitute [its] judgment for that of the Commissioner." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

## III. ANALYSIS

M.D. argues that the ALJ's decision must be reversed because (1) the ALJ's RFC determination violated the law of the case doctrine and rule of mandate and was not supported by substantial evidence, (2) the ALJ failed to provide specific and legitimate reasons for the weight

United States District Court
Northern District of California

given to the medical opinions in the record, and (3) the ALJ erred in discrediting M.D.'s statements and the witness statement provided by M.D.'s mother. M.D. argues that, under the credit-as-true rule, the Court must award benefits rather than remand this matter for further proceedings.

**A. RFC Determination**

"The law of the case doctrine generally prohibits a court from considering an issue that has already been decided by that same court or a higher court in the same case." *Stacy v. Colvin*, 825 F.3d 563, 567 (9th Cir. 2016). "The issue in question must have been decided explicitly or by necessary implication in the previous disposition." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012). "Application of the doctrine is discretionary." *Id.* "The doctrine is concerned primarily with efficiency, and should not be applied when the evidence on remand is substantially different, when the controlling law has changed, or when applying the doctrine would be unjust." *Stacy*, 825 F.3d at 567. The rule of mandate, which is more restrictive than the law of the case doctrine, provides that if a district court has received a mandate from an appellate court, the district court may "decide anything not foreclosed by the mandate" but may not "vary or examine that mandate for any purpose other than executing it." *Hall*, 697 F.3d at 1067. In the Ninth Circuit, the appellate court for this district, the rule of mandate applies to Social Security appeals and, on remand, the ALJ may not "vary or examine" the district court's mandate "for any purpose other than executing it." *Id.*; *see Stacy*, 825 F.3d at 567-68.

M.D. argues that the law of the case doctrine requires the ALJ to stand by the determination from 2021 that M.D.'s conditions would cause her to be off-task twenty percent of the time and miss two days of work per month. ECF No. 12 at 12. In his 2021 decision, the ALJ determined that M.D. had a "long history of alcoholism, which worsened her mental impairments and resulted in repeated psychiatric hospitalizations for self-injurious behavior and suicidal ideation," and "[f]or this reason," found that M.D. "would be off task 20% of the time and/or miss two day of work per month. AR at 1583. He provided the following caveat: "However, when not abusing alcohol, the claimant's mental health impairments significantly improved; this finding is consistent with her improved activities of daily living and mental status examinations during

United States District Court
Northern District of California

periods of sustained sobriety." *Id.* M.D. contends that because the portion of the ALJ decision "that included time off task and absences" was not challenged on appeal and thus was "not disturbed by the Court's remand order," the law of the case doctrine prohibited the ALJ from revisiting M.D.'s RFC and removing the limitations for time off task and absences. ECF No. 12 at 14 (citing *Almarez v. Astrue*, No. EDCV 09-00140, 2010 WL 3894646, at *6 (C.D. Cal. Sept. 30, 2010)).

The Court is not convinced by this argument. As the Commissioner explains, the ALJ's determinations in 2021 regarding M.D.'s absenteeism and time off task were based on M.D.'s alcoholism. ECF No. 17 at 3. In his 2025 decision, the ALJ considered evidence that M.D. had been sober for over three years and determined that her alcoholism was "in remission" and non-severe. AR at 1524. Updating the RFC accordingly, to remove a limitation that he had imposed in 2021 because of M.D.'s alcoholism, thus did not run afoul of the law of the case doctrine. *See O'Brien v. Comm'r of Soc. Sec. Admin.*, No. CV-25-00958, 2025 WL 4232974, at *10 (D. Ariz. Aug. 5, 2025), *recommendation adopted*, No. CV-25-00958, 2026 WL 415157 (D. Ariz. Feb. 13, 2026) (explaining that courts may reconsider an issue they already decided if, among other reasons, "the evidence on remand is substantially different" or "other changed circumstances exist"). Moreover, the Court's 2024 Order did not prohibit the ALJ from reevaluating his determination regarding the severity of M.D.'s alcoholism or its impact on her RFC. *See Hall*, 697 F.3d at 1067 (rule of mandate did not prohibit district court from deciding matters "not foreclosed by the mandate").

M.D. contends that the ALJ otherwise violated the rule of mandate by repeating the same mistakes that warranted remand of the 2021 determination. *See* ECF No. 12 at 14-15. The Court agrees. M.D. notes that in the 2024 Order, the Court deemed that it was error for the ALJ to discredit M.D.'s symptom testimony based on evidence that M.D. went grocery shopping with her mother, as this limited activities were not inconsistent with M.D.'s claimed disability and claimants "should not be penalized for attempting to lead normal lives in the face of their limitations." AR at 1652-53 (quoting *Reddick*, 157 F.3d at 722). In his 2025 determination, the ALJ once again cited to M.D.'s ability to shop as a basis for discounting her symptom testimony

and her mother's function report. *See id.* at 1527-28. Similarly, in its 2024 Order, the Court found that the ALJ "ignored critical parts of Dr. Glassmire's testimony" and directed the ALJ to reevaluate Dr. Glassmire's opinion and assess if it was truly consistent with the medical evidence in the record. ECF No. 12 at 14-15 (citing AR at 1646). The ALJ's evaluation of Dr. Glassmire's opinion is *word for word* the same in the 2021 and 2025 ALJ determinations, except that the 2025 determination includes a note that Dr. Glassmire is an impartial medical expert who reviewed the entire file. *Compare* AR at 1533-43 *with id.* at 1596-97. There is no indication in the ALJ's 2025 decision that he substantively engaged with Dr. Glassmire's opinion as part of the reevaluation that the Court previously ordered. The ALJ thus failed to comply with the Court's order to "reevaluate Dr. Glassmire's entire opinion and its true consistency with the medical evidence of record." *Id.* at 1646. Similarly, the ALJ's failure to follow the Court's directive regarding the evaluation of Dr. Guss's opinion and M.D.'s periods of "stability and improvement with sobriety," instead repeating the same errors in the 2025 determination. *Id.* at 1528, 1532, 1652-46. This violated the rule of mandate. Because the ALJ violated the rule of mandate in formulating the RFC, his RFC determination was erroneous.

### B. The Weight Given to Dr. Jee Hyun Guss

Plaintiff next argues that the ALJ failed to provide specific and legitimate reasons for the weight given to the medical opinions of Dr. Jee Hyun Guss, M.D.'s treating physician. Plaintiff also contends that the ALJ improperly evaluated the medical opinions of Dr. Glassmire, Dr. Khoi, and the state agency's reviewing doctors. *Id.* at 17-23. As the Court concludes that the ALJ incorrectly evaluated Dr. Guss's opinion and her opinion must be credited as true, the Court does not reach Plaintiff's arguments regarding Dr. Glassmire, Dr. Khoi, and the reviewing doctors.

#### 1. Legal Standard

For claims such as M.D.'s that were filed prior to March 27, 2017, ALJs must "give greater weight to certain medical opinions." *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022). "Opinions from treating physicians receive more weight than opinions from examining physicians, and opinions from examining physicians receive more weight than opinions from non-examining physicians." *Id.* "The medical opinion of a claimant's treating physician is given 'controlling

weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

If an ALJ decides to give a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider other factors "such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Id.* at 676 (citing 20 C.F.R. § 404.1527(c)(2)–(6)). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. § 404.1527(c)(6); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). Failure to consider the factors listed under Section 404.1527(c)(2)-(6) "alone constitutes reversible legal error." *Trevizo*, 871 F.3d at 676.

Second, the ALJ must provide reasons for rejecting or discounting the treating physician's opinion. The legal standard that applies to the ALJ's proffered reasons depends on whether the treating physician's opinion is contradicted by another physician. When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, "supported by substantial evidence." *Id.* at 675. When a treating physician's opinion is contradicted by another physician, an ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion, supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (internal quotations and citation omitted).

Where the ALJ "fails to provide adequate reasons for rejecting the opinion of a treating or

examining physician," courts "credit that opinion as a matter of law." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), *as amended* (Apr. 9, 1996), *superseded on other grounds by regulation*; *see Petty v. Colvin*, 954 F. Supp. 2d 914, 926 (D. Ariz. 2013) (awarding benefits where ALJ improperly discounted opinion of treating physician, and crediting physician's opinion as true necessitated finding of disability).

**2. Analysis**

Plaintiff argues that the ALJ improperly discounted the opinion of Dr. Guss, who was M.D.'s treating physician from October 2016 to April 2018. ECF No. 12 at 17. Dr. Guss provided a medical source statement in June 2018 opining about M.D.'s limitations. In relevant part, Dr. Guss opined that M.D.'s symptoms interfered with her ability to follow instructions; she required assistance from her family to engage in and complete tasks; she avoided leaving home due to her anxiety and was unable to live independently. AR at 584-85. Dr. Guss noted that M.D.'s ability to work without supervision, interact with supervisors, adapt to changes in the workplace, and react appropriately to normal hazards was "poor," meaning that M.D. could not "usefully perform or sustain" these activities; and her ability to carry out instructions, attend and concentrate, and interact with the public or coworkers was impaired. *Id.*

Because Dr. Guss was Plaintiff's treating physician, the ALJ was required to give her opinion controlling weight—as long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence in [the claimant's] case record." *Trevizo*, 871 F.3d at 675; *see Magallanes*, 881 F.2d at 751. The ALJ could only discount Dr. Guss's opinion after considering the 20 C.F.R. § 404.1527(c)(2)–(6) factors and providing "specific and legitimate" reasons for discounting her opinion. *Trevizo*, 871 F.3d at 675; *see Magallanes*, 881 F.2d at 751. Plaintiff argues that the ALJ failed to do so. The Court agrees.

**a. Alcohol Use**

The ALJ discounted Dr. Guss's opinion because Dr. Guss "did not mention how or if she evaluated the claimant's alcohol abuse on her mental functioning, and at the time of the medical opinion, the claimant was approximately six months sober." AR at 1532. He faulted Dr. Guss for

failing to explain "the effect of alcohol abuse on the claimant's mental impairments." *Id.* His reasoning is unclear: he appears to assume that Dr. Guss did not consider claimant's alcohol abuse (which, at the time of her opinion, was in remission), and if she had, she would have reached a different conclusion about M.D.'s limitations. As Plaintiff explains, this is not a legitimate reason for discounting Dr. Guss's opinion. ECF No. 12 at 18. In his 2025 decision, the ALJ determined that Plaintiff's alcoholism was non-severe based on her sobriety. *See* AR at 1524. It is unclear how Dr. Guss's purported failure to address a condition that the ALJ determined was non-severe could form a logical or legitimate reason for rejecting her opinion.

**b. Gradual Increase of Medications**

The ALJ discounted Dr. Guss's opinion because he claimed the "severe limitations" indicated in Dr. Guss's report were inconsistent with the fact that M.D. "had stopped taking all of her medications on her own accord" and Dr. Guss was only "slowly resum[ing]" M.D. on her medications "one medication at a time." *Id.* at 1531. This is a mischaracterization of the medical record. Dr. Guss's treatment notes indicate that in June 2017, M.D. had stopped taking her medications because she ran out and it was "difficult" for her to reach out to obtain refills. *Id.* at 542. Dr. Guss noted that M.D. was "feeling down" without her medication, struggled to leave the home, and was constantly supervised by her mother. *Id.* Dr. Guss's notes reflect that she decided to "reintroduce medications one at a time to streamline medication regimen and optimize maximal therapeutic benefit," not because, at that time, M.D.'s conditions were nondisabling. *Id.* Dr. Guss restarted M.D. on Effexor and increased her dosage in August 2017 when M.D. reported that she continued "to feel anxious" and had trouble with her basic activities of daily living. *Id.* at 543-45. The record is thus consistent with Dr. Guss's opinion that M.D. required constant supervision, struggled to complete tasks, was "unable to live independently," and avoided leaving home, not, as the ALJ claims, "at odds with [Dr. Guss's] opinion of debilitating limitations." *Id.* at 584-85, 1532. That M.D. briefly stopped taking her medications because she ran out—not because she believed she no longer needed them—and Dr. Guss carefully reintroduced the medications is not a legitimate reason for discounting Dr. Guss's testimony.

**c. Unremarkable Mental Status Examinations**

The ALJ next discounts Dr. Guss's opinion because it was "inconsistent" with M.D.'s mental status examinations, which he characterized as "unremarkable with the exception of some anxious and/or depressed affect and impaired judgment." *Id.* at 1532 (citing to Exhibits 1F/15-16, 2F/15-17, 3F/14-15, 5F, 6F/20, 9F/1-6 and 20F in the AR). Word for word (and exhibit for exhibit), the ALJ offered this same reason for rejecting Dr. Guss's opinion in his 2021 decision. *See id.* at 1595 ("[M.D.'s] mental status examinations were generally unremarkable with the exception of some anxious and/or depressed affect and impaired judgment (Exs. 1F/15-16, 2F/15-17, 3F/14-15, 5F, 6F/20, 9F/1-6 and 20F)."). As the Court explained in its 2024 Order:

> Although the ALJ fixates on the mental status examination findings, he ignores the fact that these are side-by-side with Dr. Guss's narrative notes that otherwise corroborate her medical opinion. *See, e.g.*, ECF No. 11-8 at 74 (finding that M.D. was "groomed," presented "no gross motor abn[ormalities]," and that her "speech [was] [within normal limits]," but also that she "[f]eels low in energy" and "feels anxious and fearful of going out"); 105 (noting M.D.'s "appropriate affect" but also that she feels anxious about going to AA meetings and interacting with others).

*Id.* at 1643-44. And as explained in that Order, notes indicating M.D.'s "unremarkable" status at medical appointments—such has appearing in adequate clothing, presenting with a calm demeanor, and not demonstrating signs of psychosis—"contradicted Dr. Guss's opinion that M.D. has anxiety about going out in public" or was "unable to live independently in the community." *Id.* at 1644; *see id.* at 516-17, 540. The ALJ's conclusion that these "unremarkable" mental status examinations were inconsistent with Dr. Guss's opinion was incorrect when the Court issued its 2024 Order in 2024, and is incorrect now.

**d. Length, Frequency, Nature, and Extent of Dr. Guss's Relationship with Plaintiff**

If an ALJ gives a treating physician's opinion less than controlling weight, they must consider "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Treviso*, 871 F.3d at 675 (quoting 20 C.F.R. § 404.1527(c)(2)). Bafflingly, although the ALJ states that he considered these factors, he somehow concluded that they showed

that Dr. Guss's opinion was unreliable. AR at 1532; *see* ECF No. 12 at 19-20. The ALJ noted that Dr. Guss had been M.D.'s treating psychiatrist for a year and a half, M.D. had "routine monthly visits" with her, and cited to the numerous medical records evidencing Dr. Guss's treating relationship with M.D. AR at 1532. The length, frequency, and nature of Dr. Guss's treating relationship with M.D., as well as Dr. Guss's "specialization" as a psychiatrist, all tilt towards giving Dr. Guss's opinion *more* weight than the opinions of non-treating physicians, not less. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). The ALJ's illogical application of these factors, absent any coherent explanation for his conclusions, is not a legitimate reason to discount Dr. Guss's opinion.

**e. Selective Summary of Records**

M.D. next argues that the ALJ incorrectly discounted Dr. Guss's opinion because he relied on a "selective summary of the treatment records, most of which are mischaracterized," in concluding that Dr. Guss's opinion was inconsistent with the records. ECF No. 12 at 20. Again, the Court agrees. For example, the ALJ cited to AR at 538 to show that M.D. had "appropriate affect, linear thought processes, and good insight and judgment" (which, he claimed, was inconsistent with Dr. Guss's opinion). The referenced progress note *also* explained that M.D. was "low in energy, feels anxious and fearful of going out, stays in bed," and it was "a big struggle for her to go to AA meetings daily." AR at 538. The ALJ cites to the AR at 540 in support of his statement that M.D. "engaged in a daily walking routine" and was tolerating her medication. AR at 1532. That progress note, from December 2016, indicated that at that time M.D. was taking Prozac, Effexor, and Abilify, but continued to experience a "depressed mood" and struggled with her hygiene or completing household chores. *Id.* at 540. The progress note reflects that M.D. did not leave the home alone. *See id.* These records, read in their entirety, are consistent with the limitations described in Dr. Guss's opinion and thus not a legitimate reason for discounting her opinion. *See id.* at 542 (progress note describing M.D.'s "appropriate affect" but indicating that she was "feeling down," struggled to attend AA meetings, and did not timely refill her prescriptions because it was "difficult" to reach out to providers), 544 (progress note describing M.D.'s "appropriate affect" and describing her "supportive environment" at home with her

mother, but noting that she continued "to feel anxious, having a hard time dealing with chores," and wanted to start therapy), 546, 548, 551.

**f. Conflicts Between Opinions of Dr. Guss and Dr. Glassmire**

The ALJ appears to have discounted Dr. Guss's opinion because it contradicted the opinion of Dr. David Glassmire, a psychologist who reviewed M.D.'s medical record in 2018 and offered opinions regarding her limitations. AR at 1533. M.D. argues that this was improper. The "opinion of a nonexamining physician" such as Dr. Glassmire "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." ECF No. 12 at 21 (quoting *Lester*, 81 F.3d at 831). The ALJ's conclusion also is based on an improper interpretation of Dr. Glassmire's opinion: Dr. Glassmire testified that M.D. would need to be limited to performing "non-complex, routine tasks" with "no interaction with the public," and that her conditions could cause her to be unable to leave home and cause anxiety in new situations. AR at 123, 127. These opinions are largely consistent with Dr. Guss's opinion, and thus not a legitimate reason to discount Dr. Guss's opinion.

The Court accordingly agrees with M.D. that the ALJ failed to provide sufficient reasons to discount Dr. Guss's opinion.[3] As the ALJ did not "provide adequate reasons for rejecting the opinion of a treating or examining physician," the Court must "credit that opinion as a matter of law." *Lester*, 81 F.3d at 834.

**C. Evaluation of Plaintiff's Testimony and her Mother's Function Report**

Plaintiff lastly argues that the ALJ's evaluation of Plaintiff's symptom testimony and Plaintiff's mother's function report were improper. *See* ECF No. 12 at 24-28.

**1. Legal Standard**

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo,* 871 F.3d at 678. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying

[3] M.D. additionally argues that the ALJ erred in weighing the medical opinions of Dr. Glassmire, Dr. Khoi and the state agency reviewing doctors. The Court does not reach these arguments in this Order.

impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014)). If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Id.* To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick*, 157 F.3d at 722). In weighing the claimant's credibility, the ALJ may consider many factors, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)). The ALJ's reasons must be supported by substantial evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

**2. Analysis**

At step one, the ALJ determined that M.D.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR at 1528. There was no finding of malingering. At step two, he determined that her statements regarding the "intensity, persistence and limiting effects of" her symptoms were not entirely consistent with the medical evidence and other evidence in the record. *Id.* Apparently referring to M.D.'s testimony and her mother's function report,[4] the ALJ concluded M.D.'s symptoms as testified to and described were

[4] As Plaintiff notes, ECF No. 12 at 24, the ALJ confusingly states that because of inconsistencies between Plaintiff's testimony and her mother's function report and the medical records, he gives their "opinion" little weight. *See* AR at 1528. Based on the overall context of the ALJ decision, the Court concludes that the ALJ is referring to M.D.'s testimony and her mother's function report, not some other "opinion" provided in support.

"inconsistent with [M.D.'s] lack of treatment, along with the unwillingness or lack of need from her and her providers in adjusting her medications," the lack of "evidence of psychiatric hospitalizations or emergency mental care, unrelated to alcohol abuse," and were inconsistent with the fact that M.D. had not "proactively sought individual therapy" since becoming sober. AR at 1528. He discounted M.D.'s "reported difficulty interacting with others" because he believed M.D. could "shop in stores, understand, and respond appropriately to providers," and discounted her "reported difficulty with concentration and completing tasks" because M.D.'s "thought processes, memory and concentration are intact and she shops," and she had not been "psychiatrically hospitalized or visited the emergency room for psychiatric reasons." *Id.* at 1428-30.

As M.D. argues in her brief, "[n]one of these reasons are convincing, as many of the ALJ's statements are unsupported by the evidence, and none of them contradict or are inconsistent with [M.D.'s] statements." ECF No. 12 at 24. For example, the ALJ determined that the claim that M.D. was "barely functioning" was inconsistent with M.D.'s "lack of treatment." But the record he references to illustrate M.D.'s purported "lack of treatment" is a progress note from June 2017, which, as described above in the discussion regarding Dr. Guss, reflects that M.D. temporarily stopped taking her medications because she ran out and was unable to "reach out" to obtain refills. AR at 542. The progress note reflects that M.D. was "feeling down," struggled to "get things done around the house," was "under direct" and constant observation by her mother, and did not leave home on her own. *Id.* The record shows that M.D. continued to receive treatment during the following months, resumed taking her medication, and that Dr. Guss adjusted her medications to try to more effectively treat M.D.'s conditions. *Id.* at 544, 546, 548. These records in no way demonstrate a "lack of treatment" or conflict with M.D.'s claimed limitations.

Similarly, the ALJ cites to medical records from 2021 that, he claims, show that M.D.'s conditions were non-severe and inconsistent with her testimony. *See* AR at 1528. These records, primarily from telemedicine appointments, describe M.D. as "[p]leasant and cooperative" with normal affect and thought processes in the mental status examination portion of each progress note. *See id.* at 2384, 2390-91, 2440. But these records consistently reflect that M.D. suffered

from anxiety and her doctors were trying to adjust her medications to treat her symptoms. *See id.* at 2390 (M.D. reported that she was "doing the same very anxious and nervous"), 2440 (reporting "increased anxiety), 2590 (reporting "multiple episodes" of anxiety). The ALJ erred in focusing on the relatively normal mental status examination findings while ignoring the narrative sections of the very same treatment notes that corroborated M.D.'s testimony, to say nothing of his decision to skip past the voluminous medical records that are entirely consistent with M.D.'s testimony about the severity of her symptoms. *See Garrison*, 759 F.3d at 1107 (explaining that, in the context of mental health issues, "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working"); AR at 532, 540, 557. Moreover, that M.D. at some points had a normal affect and coherent thoughts during telemedicine appointments does not contradict her testimony that she could not leave her home on her own or independently care for herself. *Id.*at 1556-57. That portions of M.D.'s mental status examinations were unremarkable in the context of phone calls with medical providers does not "undermine[]" her testimony regarding the severity of her symptoms and thus is not a clear and convincing reason to discount her testimony. *Brown-Hunter*, 806 F.3d at 493.

The ALJ also erred in concluding that M.D.'s ability to "shop in stores" or "respond appropriately to providers" was inconsistent with her symptom testimony. AR at 1528-29. As M.D. notes, the Court addressed the ALJ's reliance on M.D.'s ability to shop in its 2024 Order, explaining that the fact that M.D. went shopping with her mother did not "in any way detract from her credibility as to her overall disability as one does not need to be utterly incapacitated in order to be disabled." *Id.* at 1652 (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050) (cleaned up)). The ALJ repeated this mistake in his 2025 determination. Similarly, M.D.'s ability to interact appropriately with medical providers does not detract from her credibility as to her symptoms, as interacting with medical providers (frequently over the phone) to receive medical or psychological treatment "cannot be said to bear a meaningful relationship to the activities of the workplace." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

As detailed in M.D.'s brief, the ALJ's argument that M.D.'s testimony was contradicted by

medical records showing she did not regularly take medications, seek therapy or receive emergency medical treatment conflicts with the record. ECF No. 12 at 26-27. As described above, although M.D. stopped taking her medications for an approximately three-week period in 2017, *see* AR at 542, her treating psychiatrist promptly resumed her medications; M.D. continued to take medications as prescribed; and her medical providers appear to have worked with her to adjust her dosages to try to find the most effective treatment. *See, e.g.*, *id.* at 542, 555, 574, 920, 1388, 1493, 1877, 1883, 2051. The record indicates that she repeatedly sought therapy and at times had seen a therapist, *see id.* at 691, 1437, 1558, 1860, 1870, 1939, and received emergency medical treatment in 2019 and 2023, *see id.* at 918-20, 1939. Additionally, that M.D. only occasionally received emergency medical care for her conditions and did not exhibit particular psychiatric symptoms (such as psychosis or goal-driven behavior) in no way undermines her testimony about the symptoms she experienced or provided a valid basis for discounting her testimony.

In sum, the Court finds that the ALJ failed to set forth clear and convincing reasons, supported by substantial evidence, for discounting M.D.'s symptom testimony.

Similar errors plague the ALJ's discounting of M.D.'s mother's function report. *See* AR at 1527-28. For pre-2017 cases such as this, an ALJ may reject lay witness testimony only for "germane" reasons. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). The ALJ cited to M.D.'s "lack of treatment," her provider's "unwillingness or lack of need" to adjust her medications, and lack of "psychiatric hospitalizations or emergency mental care, unrelated to alcohol abuse" to discount the function report. AR at 1528. As explained above, the record does not show that M.D. did not receive treatment or her doctors determined she did not need medication, and does show that M.D. received emergency mental care and sought individual therapy. As the ALJ erred in concluding that M.D. did not need or receive treatment, there are not valid reasons for rejecting the function report.

**D. Award of Benefits**

The final issue is whether, in light of the ALJ's numerous errors, this matter should be remanded for further administrative proceedings or if the Court should award benefits to M.D.

Remand for an immediate award of benefits is warranted when:

> the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).

The Court is satisfied that these three requirements have been met here. The ALJ failed to provide legally sufficient reasons for rejecting the opinion of Dr. Guss and M.D.'s symptom testimony. The Court reached the same conclusion in its 2024 Order and remanded the matter back to the ALJ for further administrative proceedings. The ALJ then in large part repeated the same errors. Sending the matter back to the ALJ one more time to try to articulate legally sufficient reasons to reject this evidence "would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *see Ischay v. Barnhart*, 383 F. Supp. 2d 1199, 1224 (C.D. Cal. 2005). There are no factual disputes that require resolution and "further administrative proceedings would serve no useful purpose." *Smolen*, 80 F.3d at 1292.

Finally, if M.D.'s testimony, the function report, or Dr. Guss's opinion was credited as true, the ALJ would be required to find M.D. disabled. *See Garrison*, 759 F.3d at 1021 n.28. The vocational expert testified that an individual of M.D.'s age, experience, and education would not be able to find work in the national economy if she was off task eleven percent of the time, absent once per month, or required close supervision. AR at 1565-66. M.D. testified that she was too anxious to leave her house without her mother and needed her mother's assistance to complete simple tasks. *Id.* at 1556, 1559-60. Dr. Guss opined that M.D. required assistance to complete tasks, avoided leaving home, and was unable to work without supervision. *Id.* at 584-85. Her mother noted that M.D. required "repeated reminders" and "lots of assistance" to complete small tasks, was afraid to be with other people, and would not leave the house on her own. *Id.* at 1800-03. These limitations, taken as true, would be work preclusive. *See* AR at 1565-66. The Court accordingly finds that remand for an immediate award of benefits is warranted.

**IV. CONCLUSION**

For the foregoing reasons, the Court finds in favor of M.D. The Commissioner's decision is reversed and this case is remanded for the immediate payment of benefits consistent with this Order.

**IT IS SO ORDERED.**

Dated: August 7, 2026



LISA J. CISNEROS
United States Magistrate Judge